The next case, number 221268, Margarito v. Canales, et al., versus CK Sales Co., LLC, et al. At this time, Attorney Rice will introduce herself on the record to begin. Good morning, your honors, and may it please the court. My name is Amanda Rice. I'm joined here at council table by Peter Bennett. We represent the appellants, Flowers Foods, and its subsidiaries. Judge Lynch, if I may, I'd like to reserve two minutes for rebuttal. You may have it. This court is already familiar with Section 1's interstate transportation worker exemption. In a series of recent opinions applying that exemption, it has drawn a clear line between workers engaged in continuous cross-border transportation and workers who make distinct intrastate journeys. The plaintiffs in this case who purchase and take title to Flowers Products in Massachusetts and then resell those products to their Massachusetts customers clearly fall on the intrastate side of that line. This case is also different from the other Section 1 cases this court has seen in at least two different ways. First, these plaintiffs are franchise business owners who have a wide array of rights and responsibilities and no obligation to personally undertake any transportation work at all. Second, and as the Second Circuit recently held in Bissonnette, plaintiffs don't work in the transportation industry. They sell baked goods and not transportation services. Wasn't that argument pretty much done away with by Saxon? I don't think so, Judge Cayota. Quite the opposite. The plaintiff in Saxon worked for Southwest Airlines, which is quite obviously a transportation company in the transportation industry. In Southwest, the court rejected Saxon's argument that working in the transportation industry necessarily made one a transportation worker. So suppose you have a bakery. A bakery is not in the transportation industry. And it's got a fleet of 27 drivers with 27 trucks that every day pulls out and drives all over New England to deliver drugs. You would have us say that those drivers aren't engaged in transportation workers because they work for a bakery company? I'll answer your hypothetical, Judge Cayota. But first, I think this case is different because these workers work in in-state, distinct, geographic territories. Well, that's why it's hypothetical. Understood. I think that's a harder case, but I don't think that those are transportation industry workers. I think selling goods is fundamentally different than selling transportation services. Now, it follows from the text. Those are goods that cross state line, goods destined specifically to cross state lines. And doesn't Flowers also have their own employees who are drivers in some places? The plaintiffs here and the way that Flowers territories work, they're defined intrastate territories. So I can answer the hypothetical questions about if they were crossing state lines. But I think it's important to point out that here that they don't. There's no allegation that they ever cross state lines. So the bakers, the manufacturers of the baked goods, they have drivers in certain places that are their employees that do the same work that Flowers does, isn't that correct? There are some routes that are not operated by independent distributors that Flowers operates itself. That's correct. But those are still intrastate territories. And those would be employees of Flowers Foods. So we're not in this FLSA context to begin with. But I do think that it's a difficult question when you're talking about workers outside the transportation industry that cross state lines. But as the second circuit. Counsel, we know from the Supreme Court that they use the analogy to transportation workers. First Circuit hasn't quite agreed with the Second Circuit. And maybe we don't have to get into that as to whether it has to be more than analogy. But earlier you said, stressing the transportation is simply intrastate. It involves the taking of title. And that there is no obligation whatsoever in these franchise agreements to undertake any transportation at all. And then you got yourself into a bit of trouble with the transportation argument. So I've now identified three things. Is there more to what you consider to be the essential analyses here? I think you've described it accurately, Judge Lynch. I think you can look at the nexus. I've described your argument. That's all I've done. But I think you've described it correctly, that there's a question about the nexus to cross-border transportation. That was the question in the sort of Lyft cases and the Postmates cases. Wasn't about, it was undisputed in those cases that those workers were in the transportation industry. Sort of all they were doing was delivering goods. And so the only question at issue was whether they were sort of sufficiently connected to cross-border transportation. Well, that nexus question gets described in different terms in different circuits. The Seventh Circuit has basically said that the work has to be essentially part of the interstate transportation of goods or people. And in Mediato, we quoted that language. So maybe this goes to how close a connection it has to be to transportation workers. But I want to ask you something else. The First Circuit has, for a long time now, referred to other statutes other than by analogy to interpreting this exemption. And each time we've done it, it has been more or less on the basis that those statutes are broader. But even under those statutes, this isn't interstate commerce. So what's going on in this case is that your opponents are trying to turn it around and use the language from our opinions, drawing that analogy to say, ah, well, if you're going to draw the analogy, then you ought to look at things that did qualify as interstate commerce. And we ought to, therefore, find that those are the tests. And well, maybe the analogy only works one way. Maybe it doesn't work because this is narrower. But I wanted to ask your views about our use of analogy to other statutes. It's a good question, Judge Lynch. I think this circuit has looked to cases interpreting other statutes. And I think they do so in exactly the way you suggest. The Sherman Act, for example, is broader than the transportation worker exception. But with that understanding in mind, this court has sometimes looked to cases interpreting the Sherman Act to say, well, if it falls under that formulation, it certainly falls under this one. I think my friend on the other side is focused specifically here on the Motor Carrier Act. So I might speak to that in particular. I think that that analogy is actually weaker than the ones that this court has accepted. Plaintiffs have identified no statutory text that's similar or relevant to the analysis. So it's hard to see how those two statutes even arguably are analogous. The 11th Circuit addressed that statute in particular in the Hamrick case and explained that they really are not analogous. They're distinct statutory regimes addressing distinct problems. So I guess if that answers your question, Judge Lynch, I think the case law interpreting, say, FELA or the Sherman Act, courts have sometimes looked to determine whether something qualifies as interstate commerce. But I would also say the last section of this court's opinion in the Postmates case, where it addresses the difference between Section 1 of the FAA and Section 2, Section 2 has that kind of broader formulation. It reaches more to the limits of Congress's powers. Yes, but we've drawn the analogy not just as to Section 2, but also as to Section 1. Now, maybe we were wrong to have gone down that path, but we have. So you've identified the Sherman Act, and what are the others? FELA, I think Wythaka and Rittman have sort of looked to that statute. I think they're only relevant insofar as it goes. Courts have sometimes looked at those cases and says, well, if it qualifies under the Sherman Act, it certainly fits within this narrower exemption. I think you were right to suggest it doesn't go both ways. And I also think, even with those analogies, to be quite careful, because the statutory language here is different than any other statute I've seen. Remember, its focus is on seamen, railroad employees, and other transportation workers. And as the Supreme Court and this court have consistently recognized, those two introductory terms, seamen and railroad employees, limit and define the scope of what we've called the residual clause here. None of the other statutes that I'm aware of are structured that way. So while the case law interpreting those statutes is sometimes relevant, I think you should be quite careful with those analogies. Let's assume, if you would, that the people who drive the trucks from the flowers to the distributor and from the distributor to the retailer are transportation workers. They drive trucks. Let's assume that for a second. Your argument would then be that that journey, even though it starts in one state and ends in another, is actually two journeys, not one integrated journey, if I understand your argument. That's correct. They are distinct intrastate transactions. That's what's not clear to me. Let me pose this hypothetical. A retailer in Brunswick, Maine, calls the dealer and says, I would like 10 widgets from Acme Company, which is in Massachusetts. And the dealer says, I'll get you those 10 widgets. And the retailer says, and I'd like them delivered to my store from Acme. And the dealer says, I'll take care of that. So the dealer calls Acme, orders them. Acme puts it on its trucks, sends it up to the dealer. The dealer gets them, puts it on its trucks, and drives them, completing the journey that was requested by the party, the retailer. That sounds like one integrated journey. There was an agreement between the dealer and the retailer to get goods from Acme up to Brunswick, and they did it. Why wouldn't we be well-suited to say that's one integrated intrastate journey? District Attorney, that might be a closer case, but it really doesn't look like this one here. Well, my question wasn't whether it looked like this one. My question was, why isn't that an intrastate, one intrastate journey? I think the question is whether that is a continuous transaction. And in answering that question, this court, in cases like Withocka and Postmates, have looked to whether the journey is continuous. Well, what about Walling? Are you familiar with the Supreme Court's decision in Walling? I am familiar with the Supreme Court's decision in Walling. And doesn't that describe a situation much like what I just described, except title in Walling actually transfers, and yet this court still found one continuous journey? With the caveat that that's a Fair Labor Standard Act case and sort of implicates some of the questions that Judge Lynch was asking earlier. Sure, which might go to how direct an impact intrastate commerce might be. But I haven't seen anything in your brief that suggests that any of the differences between the different formulation of intrastate bear not just on indirectness issue, but bear on the integrated journey issue. As I understand the facts in Walling, to speak to them specifically, that was a single transaction. It was much like the Amazon fact pattern, where a customer ordered products and then those were delivered with a stopover in a warehouse. And I think it's clear from this court's precedent that just a stopover in the warehouse, if that's all that's happening, isn't enough to break up. It changed who had them, too. Title passed at the warehouse in Walling. I'm not sure if that's right, Your Honor. If it is, I don't think that then that's a good analogy for this context, the BFAA. Why not? Because where title passes, and in here, too, the risk of loss passes. You know, if the goods were to- But it did in Walling, in at least one of the scenarios found by the court to be continuous. I think then the answer to that has to be in the difference between the FLSA and the FAA. The question whether someone is engaged in intrastate commerce for purposes of the FLSA. What is it about the language of the FLSA, as compared to the language about this statute, that would bear on whether a journey is one integrated journey or two parts of a journey? The statute here speaks of seamen, railroad employees, and transportation workers engaged in interstate or foreign commerce. And I think this is- Doesn't the case law under the FLSA say that Congress intended to act to the fullest extent of its powers under the Commerce Clause, whereas we have exactly the opposite statement from the Supreme Court about Section 1 of the FAA? That's exactly right, Judge Lynch. It's much more like Section 2 of the FAA that extends more broadly to anyone involved in interstate commerce. So you're saying the FLSA expands as far as constitutional boundaries, the in-commerce requirement of the FLSA? What case holds that? I'm not saying that, Judge Kaddas. I'm just saying it's given a broader construction, and like Section 2. Well, what construction says it's broader than the construction we have here, engaged in commerce? I'm not sure. What words are you relying on? That it doesn't get the narrow construction that this Court and Circuit City have said that the FAA gets. It has a broad remedial purpose. So I'm focusing on the language used to construe the FAA, not the FLSA. But my understanding of that statute is that it's not as narrowly focused as this one, and the analogies, as Judge Lynch raised, are dangerous for exactly that reason. I reserve the remainder of my time for rebuttal. Thank you, counsel. At this time, if Attorney Rudolph would introduce himself on the record to begin. Good morning, Your Honors. Benjamin Rudolph on behalf of Margarito Canales and Benjamin Bardzik. My clients spend at least 50 hours a week, every week, driving large commercial trucks as a constituent and essential part of a continuous journey transporting flowers, products, and services from Flowers Bakery in Maine, to Flowers Warehouse in Massachusetts, to Flowers Customer Stores, along routes designated and described and defined by Flowers. That's established in the record through affidavits. It's not controverted. Applying the analysis from the Court's holdings in Wysocka, in Cunningham, and now in Imediato, my clients are clearly transportation workers for purposes of the exemption in Section 1 to the Federal Arbitration Act. I view Imediato as completing a project that this court began in Wysocka, continued in Cunningham, and is now complete. We have a simple, comprehensive- How would it, we'll say, counsel, but this case alone tells us our journey is not complete. So let's assume they're transportation workers. To your mind, does that end the analysis? It does, Your Honor. We don't engage in this transportation industry question that Flowers wants us to, because we don't- Is there anyone employed in the country as a driver, is within a driver delivering people or goods, is, therefore, within the Section 1 exemption? No, Your Honor. Imediato draws a very clear line between- I'm going to answer the question. The answer, Your Honor, is no. If they're purely engaged in local economic activity, like in Imediato, they are not transportation workers, because they're not engaged- So the fact that they are driving, and that's primarily what they do, and they're driving goods, is not the dispositive fact in your analysis? That's right, Your Honor. It's an important fact. It's not dispositive. What's dispositive is that the journey is continuous, and that my clients, like the yellow cab drivers in the example cited in Cunningham, going between stations, are merely a constituent component of a continuous journey. And I think Imediato provides really good facts here, because we can, as we're speaking, imagine a Postmates driver going to a store and picking up a loaf of bread that one of my clients delivered, that was manufactured by Flowers in Maine, and which one of my clients delivered to that store. The local economic activity there is the Postmates driver picking up the loaf of bread. But the interstate commerce journey, as Imediato instructs us, ends when my clients bring it to the store, to the retailer. Here's a conceptual problem I have. Almost everything in our society now moves one way or the other across state lines or across international lines. There are very few goods, maybe artisanal stores in Maine, that are purely local. Almost everything you get from the grocery store, for example, originates somewhere else. It's also true of weapons. It's true of just about everything. And so your test seems to me to encompass almost every activity in our economy. But that is contrary to the language about narrow construction. It's contrary to must be essential. So what are the limiting principles that you see even adopting your point of view? Well, Your Honor, I know that was the question Imediato in the oral argument that the court was focused on. And to my mind, Imediato answered that question. But in this case, I'll answer the question. I was on the panel. I don't think it has. Understanding, Your Honor, so I'll provide an answer, Your Honor. I think it matters where the goods are intended when they're ordered, and in this case, when they're manufactured. And in the distributor agreements, Flowers concedes that they are manufacturing their products for these stores. Section 8 of the distributor agreement, which I believe is on page 40 of the appendix, Your Honor, and the distributor agreement's in the appendix several times. But it says, your obligation is to maximize the sales to these stores for whom we make the goods. So I would argue that this is actually a narrower case than even Huaythaca. Because in Huaythaca, the drivers are carrying goods from all over the world. Some are manufactured in China, or Texas, or who knows where. Here, Flowers is manufacturing. If a manufacturer in Texas comes up with, let's say, AirSats maple syrup, and he knows that the largest market for maple syrup is New England, and he targets New England, his intention to have the goods go to New England for further distribution there, you would say that manufacturer is within Section 1? Not necessarily, Your Honor, because it's also important that that manufacturer develop and construct a delivery system. And that's what's happened here. Flowers has a direct store delivery service. That's their term. They created this service so that they can distribute throughout the country. And they know when they're making this bread in Maine, it's going to these stores in Massachusetts, and they want my clients to deliver it. And that's a distinction. So we know from the beginning to end, Flowers is involved from beginning to end. And the bread is ordered through Flowers Proprietary Administrative Services. That's referred to in the distributor agreement. My clients have to use those proprietary administrative services. I would add, too, Your Honor, because we've been talking about the title. I'm sorry, what are those services? What they are is it's actually a handheld device, Your Honor, and there's a software. And this is all developed and provided by Flowers, through which you have to make all the orders for the bread, through which Flowers issues suggested orders to my clients and reserves the right to automatically add or subtract from those orders unilaterally without my clients having any discretion. And I would add, Your Honor, that as part of the distributor agreements and as part of this scheme, Flowers retains control over the accounts receivable for all the chain accounts. So for a market basket, for a stop and shop, they're getting paid directly. So the notion of title of the bread transferring, I think, is much more fiction than reality. On the record of what happens here, there are a few things that are unclear. Is there anything in the record that indicates who unloads the trucks when they arrive from Flowers to your client? In my client's affidavit, they explain that they pick up the bread from the warehouse and they take it to the stores. I'm not sure if the breakdown is specifically, yes, we load and unload them. They do in reality, Your Honor. No, I'm talking about the trucks when they come from Flowers. They arrive at a warehouse, right? Right, in North Shredder. Who owns that warehouse? Flowers. And who unloads, I take it, Flowers then unloads it into the warehouse? I'm not sure that's in the record, Your Honor. But it doesn't stay very long at the warehouse at all. When Flowers ships, for example, a store orders so many hot dog rolls that they want for next week, does Flowers have a shipment that's targeted when it leaves Flowers to fulfill that order? Or is it just in bulk and your client accesses it in trade? No, there are specific orders for specific stores. And that's all run through this proprietary administrative service that Flowers is providing. And where is that in the record? Well, the distributor agreements describe how they have to use this administrative service. But is there anything in the record that flushes that out, that says, here's, in other words, that when a pallet leaves Flowers, you could point right at that pallet, or Flowers could, and says that's going to Hannaford's in South Portland, Maine. I'm not sure the record elucidates that, Your Honor. But my clients in their affidavit do point out that they're instructed as to how specifically to place the bread on the shelves in the individual stores. Do the invoices have the name of the destination on them? Yeah, I believe so, because these settlement statements say it. Well, you believe so. Is there anything in the record that shows what the invoices look like? I don't think so, Your Honor. And I think if the court is interested in more factual development, certainly an option, which happened in the Uber versus Sing case, was to remand and instruct that more discovery be conducted. I don't think that's necessary in this case, though. Because I think under Wythaka, Immediato, and Cunningham, we know what's going on here. And it's transportation for purposes of the exemption to the FAA. Your Honor, the question of the franchise agreement and the relationship between that and the distribution agreement and exactly what they mean, of course, goes to other issues. But it seems to me they play on these issues as well. Your opponent says, look, these are franchisees. They can do what they want. They can structure their business pretty much as they want. And we should take account of that. What do you reply to that argument, that the fact that they're franchisees makes a difference in the distribution chain model that we have? Well, as Your Honor pointed out, it does sort of dovetail into the question of misclassification, which is not an issue before the court. That's right. So let's go back to the question I asked. Yes. It's in the distributor agreements. It's part of the legal fiction they're trying to perpetuate. But then it's contradicted by the affidavits my clients have submitted. My clients say, we don't actually have any control here. We don't actually get to do what we want with the bread. We don't get to do any marketing. We are delivering solely for flowers. We're delivering solely flowers products. Yeah, but here's the problem with the affidavits. Just if you're thinking about the Section 1 exemption, the issue before the district court is does it go to arbitration or doesn't it? And if it goes to arbitration, the arbitrator can resolve all of this. It's pretty easy to look at legal documents. But once you start getting into evidentiary disputes, what was meant to be a kind of quick and easy look to determine the arbitration question then becomes full-blown litigation on its own. And that's certainly not why Congress wanted to protect arbitration. No, and I don't think that's ideal at all, Your Honor. But I think in this case the question is, as we know from Saxon, as we know from Immediato, what are my clients actually doing? Not what they're supposed to be doing or theoretically could do. Because in Saxon she was a ramp supervisor. And actually Southwest Airlines had a policy saying you are not supposed to ever unload or load cargo. But she submitted an affidavit saying, well, I frequently do whether I'm supposed to or not. And the Supreme Court said that's what matters, not what Southwest Airlines' policy is, but what she's actually doing. And we have uncontroverted evidence here about what my clients are actually doing, regardless of what they could do or what Flowers thinks they might have the freedom to do. So we don't need to address those issues because we know what they're doing. Why doesn't it matter about what freedoms to do they might have? In other words, they're driving. But the document itself allows them to expand, to try to find other markets. The fact that they're not doing it might mean they don't have time to do it. But does it mean that they could be doing it? And does that make a difference? No, Your Honor. I don't think it makes a difference at all. Just like it doesn't make a difference that Saxon could have been spending her time supervising other people instead of unloading and loading cargo. The practical realities made her do that, and the practical realities are making my clients do the actual driving. I would like to note, too, that I take issue just a little bit with the District Court's conclusion that the distributor agreements do not require my clients to personally perform any services. The personal guarantee upon which Flowers relies actually contains language saying, if the goods don't get delivered, we're looking to you personally. We want you to personally guarantee that they get delivered. And so Flowers actually does reserve the right to say, no, you, Margarito Canales, and you, Ben Bardzik, you have to go deliver the bread. You've got to jump in the truck and deliver the bread. So that's in the distributor agreements. So that matches the reality of what's happening, which is they are delivering the bread. Day after day, week after week, that's what they do. With no further questions, I'll thank the panel, and I will encourage the panel to affirm the District Court's decision. Thank you very much. Thank you, Counsel. At this time, if Attorney Rice would please reintroduce herself on the record to begin. She has a two-minute rebuttal. Thank you, Your Honors. Amanda Rice again for Flowers Foods and its subsidiaries. Just got three quick points. First is I still don't think I've heard a limiting principle on the interstate nexus question. I think title passing is a good line, and as best I can tell is the focus of the Postmates sort of distinct transactions inquiry. Second, on the facts, the questions that Your Honors were asking, the answers to them are mostly not in the record. But my understanding is that third-party delivery services drop these goods at the warehouses and then unload them, and they do so in bulk, not in connection with specific orders. And then finally, to speak to the role of these workers as franchise owners, the point is not about the technical classification of these workers. It's about their job and what makes them different from seamen and railroad employees. These are business owners who buy Flowers products, resell them, and pocket the difference in those prices. And that's not just hypothetical here. The record reflects that plaintiffs hired helpers to do the work for them. They had part-time workers in their first three territories, and then a full-time employee in their fourth one. And that's in the appendix at 19 through 20, again at 90, and 122 to 123. And it's important to remember here too that plaintiffs actually own these territories, and they can resell them at a profit. Again, that's not hypothetical here either. These plaintiffs owned three territories, they purchased a fourth, and then they resold that fourth territory, and then at the same time If they spend 50 hours a week driving a truck, how do we say they're not, aside interstate issue, how do we say they're not transportation workers? Courts have used different language in addressing this question. Cunningham asks if they were primarily devoted to the movement of goods and people beyond state boundaries. Wallace speaks about the central part of their job description. I submit that the distributor agreements and the business plans show that Saxon just says frequently, and 25% was enough. These guys spend 50 hours a week driving trucks. Sounds like transportation industry to me. Respectfully, I don't think Saxon meant to displace those standards. It did use the word frequently, but even if frequently is the standard, and even putting aside the interstate aspect and the industry question, still these distributor agreements make clear that these plaintiffs are not personally obligated to undertake transportation at all. Well, no driver is. They could go to work, you know, in a construction project, but in fact they're spending 50 hours a week driving, so if you ask them what do you do, I transport goods 50 hours a week. I'm not sure that's right. I do think most drivers, their job is to drive, and they're contractually obligated to drive. If you're an Amazon delivery driver, if you're a Postmates driver,  these plaintiffs' job is to run a small business, and they may choose to drive, and I don't think frequently is the standard, but even if it is, they don't have to drive at all. If Your Honors have no further questions, I'd ask the Court to reverse the decision below. Thank you. That concludes argument in this case.